(No. 72303.—

DAVID HARTLEIN, Appellee, v. ILLINOIS POWER
COMPANY, Appellant.

*Opinion filed October 1, 1992.*

144

CUNNINGHAM, J., took no part.

Carl W. Lee and Thomas R. Peters, of Gundlach, Lee, Eggmann, Boyle & Roessler, of Belleville, and Arthur J. Kowitt, Danuta Bembenista Panich and Jeffrey S. Fowler, of Mayer, Brown & Platt, of Chicago, for appellant.

Amiel Cueto, of Cueto, Cueto & Cueto, Ltd., of Belleville, for appellee.

JUSTICE FREEMAN delivered the opinion of the court:

Plaintiff, David Hartlein, filed a petition for a temporary restraining order, preliminary injunction, and per-

manent injunction in the circuit court of St. Clair County. The petition alleged that the defendant, Illinois Power Company (Illinois Power), Hartlein's employer, sought to discharge him in retaliation for his exercise of rights under the Workers' Compensation Act (the Act) (Ill. Rev. Stat. 1987, ch. 48, par. 138.1 *et seq.*). The circuit court entered a temporary restraining order. Following hearing, the circuit court granted a preliminary injunction. Defendant appealed. The appellate court affirmed. (209 Ill. App. 3d 948.) This court granted defendant's petition for leave to appeal pursuant to Supreme Court Rule 315 (134 Ill. 2d R. 315). We now reverse the appellate court's decision.

## ISSUE

The issue presented is whether the trial court abused its discretion by granting a preliminary injunction, where an employer had, allegedly, begun discharging an employee in retaliation for his exercise of rights under the Workers' Compensation Act.

## FACTS

On June 15, 1987, Hartlein injured his right foot while working as an apprentice lineman for Illinois Power. At the time, Hartlein had worked for Illinois Power for approximately eight years. After being injured, Hartlein began receiving "temporary total" disability (TTD) benefits in accordance with the Illinois Workers' Compensation Act (Ill. Rev. Stat. 1989, ch. 48, par. 138.8(b)).

In November 1987, Dr. Samuel Chen, Hartlein's treating physician, released Hartlein to return to work under restrictions of "light duty and limited walking" and "no climbing." In December 1987, Dr. Maurice Miller examined Hartlein at Illinois Power's request and concluded that it would be unsafe for Hartlein to return

to work as a lineman. Dr. Miller recommended that "alternative forms of work should be evaluated."

In June 1988, ConServCo, a "disability management and rehabilitation service" retained by Illinois Power, began providing rehabilitation services to Hartlein. Michael McKee, a rehabilitation consultant employed by ConServCo, arranged for Hartlein's evaluation by Dr. Sherwyn Wayne, an orthopedist.

Sometime in July 1988, Dr. Wayne concluded that it did not appear that Hartlein could be rehabilitated to resume his former position as a lineman. Dr. Wayne stated, however, that Hartlein was "definitely a candidate for work in the medium level" following appropriate rehabilitation. Wayne stated that the position of meter reader was within that category. He also stated that it was possible that Hartlein might perform at the "medium/heavy work level, such as that performed by a warehouseman" as Hartlein had the strength capacity to perform that job and the work entailed could require less walking than meter reading. Wayne recommended that Hartlein undergo a "work hardening" program at the Cole Center for Work-Related Injury (Cole). At the request of Illinois Power, arrangements were made for Hartlein to participate in the program.

Hartlein began participating in the program at Cole during August 1988. Cole preliminarily evaluated Hartlein as being marginally able to return to work at both the "medium" and "medium/heavy" levels of job demand standards established by the United States Department of Labor. While Hartlein was participating in the rehabilitation program, his attorney, Amiel Cueto, wrote to Preston Martin, Illinois Power's disability claims adjuster, complaining that Illinois Power and its agents were threatening to discharge Hartlein. According to Cueto's letter, someone named "Doug" told Hartlein that "if [Hartlein's] foot didn't get better soon,

[Hartlein] would have to find a new job somewhere else." Cueto further claimed that the rehabilitation which Hartlein was undergoing was related to developing upper-body strength and was not directed toward rehabilitating Hartlein's foot.

At the end of September 1988, Dr. Wayne released Hartlein to return to work at Illinois Power. In October 1988, Hartlein resumed work with Illinois Power as a meter reader. This assignment ended, however, in mid-December 1988, because Hartlein's foot injury prevented him from completing his routes. Once again, Hartlein began receiving TTD benefits.

On January 6, 1989, Cueto wrote to Martin, advising him that Hartlein would participate in a vocational rehabilitation program, involving interviews with other employers, even though Cueto believed that Hartlein was not required under law to participate in the employer's program. Cueto recalled that he had earlier asked Martin whether Illinois Power was going to fire Hartlein, and Martin allegedly responded "I wouldn't exactly call it 'firing,' it's just that [Hartlein] can't do the job and so he's going to have to find another one." Cueto suggested to Martin that Hartlein be assigned to a position within his capacities ("garage-type" job, light-duty meter reader, storeroom), much as Illinois Power had done for another employee. Cueto further advised that Hartlein would not resign his job at Illinois Power unless he was guaranteed another "exactly comparable" job.

On January 6, 1989, Martin wrote a memo to Cueto. Martin confirmed that Cueto had denied him permission to contact Hartlein directly with respect to "job development and eventual placement with a new employer."

On January 17, 1989, Cueto again wrote to Martin. According to Cueto, McKee had visited Hartlein that day and told him to begin drafting resumes. With respect to Hartlein's continued employment, McKee told Hartlein

that "nothing is forever," and advised him not to volunteer information about the condition of his foot to prospective employers. Cueto demanded that Illinois Power put its vocational rehabilitation plan in writing. He reiterated that Hartlein would "not voluntarily resign *** unless he gets another job exactly comparable in every respect." The same day, Cueto also wrote to McKee, advising him that Hartlein would cooperate with Illinois Power, "so that Illinois Power [would] have no pretext to fire him."

On January 31, 1989, Cueto wrote to Martin once again. Cueto requested written clarification as to whether Hartlein was being "requested" or "ordered" to cooperate with vocational rehabilitation. Cueto stated that if Hartlein was being requested to cooperate, Hartlein would not. Cueto advised that Hartlein might decide, however, to participate in a "real" vocational rehabilitation program of his own choosing. During a subsequent telephone conversation between Cueto and Martin that same day, Martin advised that Illinois Power considered its directive to Hartlein to be a request. During cross-examination at the preliminary injunction hearing, however, Martin agreed with the characterization that Hartlein was "ordered" to participate in rehabilitation.

McKee subsequently sent Cueto a written proposed rehabilitation plan which called for a "job search and attempted placement" to be conducted "within and outside Illinois Power." McKee requested that Hartlein submit his own rehabilitation plan should the proposed plan be unacceptable. In February 1989, Hartlein, through Cueto, rejected the plan submitted by McKee; the "job search" described in the plan was considered "unnecessary and unwarranted." Hartlein continued to receive TTD benefits throughout the balance of 1989.

In March 1990, McKee advised Cueto that Illinois Power had no current positions within Hartlein's physical limitations. McKee stated that Hartlein's file was being reactivated to conduct "labor market surveys and job development activities to demonstrate that employment opportunities are available within [Hartlein's] last known physical limitations."

On April 11, 1990, Martin wrote to Hartlein, stating:

"I am sending you a list of prospective job listing [sic] and we ask you contact these businesses regarding job availability.

Please start the job search as soon as you receive this material. Within two weeks please advise me the name of the company, person conducting the interview and the results of each interview.

It is most important the job search be done to comply with the worker's compensation law."

Hartlein filed the instant action, seeking a temporary restraining order, preliminary injunction and permanent injunction. Hartlein alleged that, by directing him on April 11, 1990, to start a job search, Illinois Power had "started the process of retaliatory discharge." The trial court subsequently issued a temporary order restraining Illinois Power from discharging Hartlein, injuring his employment rights, discontinuing "any rights or benefits or privileges" of his employment, ordering him to apply for other jobs, or changing the status quo. Shortly thereafter, hearing on the preliminary injunction was held. The parties stipulated to the facts presented in Hartlein's petition, an attached chronology, various letters, and his supporting affidavit.

Martin testified during the hearing that, Illinois Power had no currently available positions which Hartlein was then physically able to do. Other than Cueto's proposal to Martin that Hartlein be transferred to other positions within his capacities at Illinois Power,

no evidence was offered concerning such other positions, their availability, or whether Illinois Power did or did not pursue Cueto's proposal. Martin further testified that Illinois Power had no plans to discharge Hartlein, nor did it intend to discharge him if he did not apply for other jobs. Martin testified that Illinois Power did intend, however, to terminate Hartlein's TTD benefits in accordance with the Act if he did not make a *bona fide* effort to find another job. Martin also confirmed that, in such case, Hartlein's TTD benefits would be terminated based upon his refusal to apply for other jobs and the information Illinois Power had about his "medical availability." According to Martin, he believed that the Act authorized a termination of TTD benefits in such cases. Martin acknowledged, however, that Hartlein was then "temporarily totally" disabled, had not been medically examined in over a year, and that a recently scheduled examination had been cancelled by Illinois Power for unrelated reasons.

The circuit court subsequently granted the preliminary injunction, fully incorporating the terms of the temporary restraining order. The court stated additionally in the preliminary injunction order that it was "not enjoining Illinois Power from applying or petitioning *** the Industrial Commission on any matter." Illinois Power appealed.

Hartlein's union, thereafter, filed a grievance pursuant to the collective-bargaining agreement between itself and Illinois Power, alleging that a position of storehouseman, which had been recently posted for bidding by Illinois Power, should have been awarded to Hartlein.

On March 11, 1991, the appellate court entered its judgment, affirming the circuit court's grant of preliminary injunction. The appellate court found that Illinois Power had effectively discharged Hartlein by directing him to apply for work with other employers and that

such discharge was in retaliation for his exercise of rights under the Act. In doing so, the appellate court interpreted the preliminary injunction as restraining Illinois Power from altering Hartlein's employment status, or discharging or threatening to discharge him.

Shortly after entry of the appellate court judgment, Hartlein filed a petition for rule to show cause in the circuit court action, alleging that, due to his "seniority rights" guaranteed under the collective-bargaining agreement, he was entitled to be transferred by Illinois Power from the position of meter reader to storehouseman. Consequently, Illinois Power filed a petition for removal in Federal district court on the basis that the court had original jurisdiction over these latest claims of Hartlein. After considering the matter, however, the Federal court remanded the case to State court.

Hartlein also filed, after the appellate court judgment, a second retaliatory discharge action against Illinois Power. This second action sought compensatory and punitive damages, allegedly resulting from the same acts of retaliatory discharge on which the instant equitable action was based. The trial court in this second action subsequently granted summary judgment in Hartlein's favor on the basis of the appellate court's finding of retaliatory discharge in the instant cause.

We subsequently granted Illinois Power's petition for leave to appeal.

## JURISDICTION AND MOOTNESS

Hartlein preliminarily contends that this court lacks jurisdiction to consider this appeal. Specifically, Hartlein argues that the petition for leave to appeal is time-barred under Supreme Court Rule 315(b), having been filed more than 35 days after "the judgment appealed from." (134 Ill. 2d R. 315(b).) Hartlein further contends

that the question presented by this appeal is now moot. We disagree with both contentions.

Supreme Court Rule 315(b) provides that if an affidavit of intent to file a petition for leave to appeal is filed in the appellate court, the petition is to be filed in the Supreme Court within 35 days of the judgment from which the appeal is taken. (134 Ill. 2d R. 315(b).) In this case, the appellate court entered its judgment on March 11, 1991, and Illinois Power filed its affidavit of intent on March 29. On April 15, Illinois Power filed a notice in the circuit court, removing the case to Federal district court. On July 23, 1991, the Federal district court remanded the case to the circuit court. We take judicial notice (see *May Department Stores Co. v. Teamsters Union Local No. 743* (1976), 64 Ill. 2d 153, 159) that a certified copy of that order was filed in the circuit court on July 24, 1991. (See 28 U.S.C. §1447(c) (1988) ("A certified copy of the order of remand shall be mailed by the clerk to the clerk of the State court. The State court may thereupon proceed with such case").) Illinois Power then filed its petition for leave to appeal in this court on July 25, 1991, 136 days after entry of the judgment, but only 35 days after entry, excluding the time period during which the case was removed.

When a petition for removal has been filed in Federal district court and other requirements of section 1446(e) of the Federal Judicial Procedures code (28 U.S.C. §1446(e) (1988)) have been met, the State court loses jurisdiction to proceed further until the case is remanded. (See *Eastern v. Canty* (1979), 75 Ill. 2d 566, 571.) Furthermore, when a case is removed from State to Federal court, the entire action, including all of the parties and their claims, is transferred to the Federal court. (See *Moore v. Interstate Fire Insurance Co.* (S.D. Miss. 1989), 717 F. Supp. 1193, 1195; accord *Lingle v. Norge Division of Magic Chef, Inc.* (1988), 486 U.S. 399,

100 L. Ed. 2d 410, 108 S. Ct. 1877.) While we have not had occasion to decide the effect of removal upon the time limitations of Supreme Court Rule 315(b), other courts have held that removal tolls similar statutory limitations for the filing of an appeal. (See *Strasser v. K L M Royal Dutch Airlines* (C.D. Cal. 1986), 631 F. Supp. 1254, 1257 (holding that removal to Federal court tolled statutory 60-day limitation period for filing State appeal); *General Electric Credit Corp. v. Smith* (Fla. App. 1986), 484 So. 2d 75, 77 (holding that time period for filing State appeal was tolled during removal); *Brogdon v. Ruddell* (Tex. Ct. App. 1986), 717 S.W.2d 675, 676 (holding State jurisdictional timetable within which appellants would have been required to perfect their interlocutory appeal was suspended by removal and resumed upon remand).) We consider these authorities to be persuasive.

Given our lack of jurisdiction to consider a petition for leave to appeal during removal, it logically follows that the 35-day limitation period of Rule 315(b) was tolled by removal. Thus, the petition for leave to appeal was filed within the time limits of Rule 315(b). Accordingly, we deem that jurisdiction is properly vested in this court.

Turning to Hartlein's second preliminary contention, we conclude that the question before us is not moot. The preliminary injunction enjoined Illinois Power from, *inter alia*, discharging Hartlein, "changing the status quo," or discontinuing any "rights or benefits or privileges" of his employment. Hartlein advises that he has returned to work and is now employed by Illinois Power as a warehouseman. Citing *Harris v. Education Officers Electoral Board of Community Consolidated School District 110* (1990), 203 Ill. App. 3d 917, Hartlein argues that these subsequent developments mean that any rul-

ing by this court would be advisory, having no practical effect upon the controversy. We disagree.

Illinois Power remains restrained from discharging Hartlein or discontinuing any of his employment rights, privileges or benefits, regardless of any reason for doing so. To that extent, it is not impossible for this court to grant Illinois Power effectual relief. (See *In re A Minor* (1989), 127 Ill. 2d 247, 255.) A judgment in Illinois Power's favor would allow it to discharge Hartlein, if it so chooses, or modify Hartlein's employment benefits. A judgment in Hartlein's favor could allow him permanent employment with Illinois Power without any change in his existing benefits. (See *In re A Minor*, 127 Ill. 2d at 257.) Accordingly, the question before us is not moot. Having resolved the preliminaries, we now consider the substance of this appeal.

## DISCUSSION

The purpose of a preliminary injunction is to preserve the status quo pending a decision on the merits of a cause. (*In re Adoption of Scraggs* (1988), 125 Ill. 2d 382, 388.) It is an extraordinary remedy which is applicable only to situations where an extreme emergency exists and serious harm would result if it is not issued. (*Buzz Barton & Associates, Inc. v. Giannone* (1985), 108 Ill. 2d 373, 386.) The four factors which must be established before an injunction will be granted are that: (1) a clearly ascertained right in need of protection exists; (2) irreparable harm will occur without the injunction; (3) there is no adequate remedy at law for the injury; and (4) success on the merits is likely. (*Scraggs*, 125 Ill. 2d at 388.) In ruling on a motion for preliminary injunctive relief, however, controverted facts on the merits of the case are not decided. See *Dixon Association for Retarded Citizens v. Thompson* (1982), 91 Ill. 2d 518, 524.

When considering the discretion exercised by the trial court in issuing a preliminary injunction, a reviewing court may decide only whether the petitioner has demonstrated a *prima facie* case that there is a fair question as to the existence of the rights claimed; that the circumstances lead to a reasonable belief that they probably will be entitled to the relief sought, if the evidence sustains the allegations of the petition; and that matters should be kept in status quo until the case can be decided on the merits. Thus, the only question before the reviewing court is whether there is a sufficient showing to sustain the order of the trial court. See *Dixon*, 91 Ill. 2d at 524-25.

### Existence of a Clearly Ascertainable Right

Illinois Power contends that Hartlein failed to establish a "clearly ascertained right" needful of protection. (See *Scraggs*, 125 Ill. 2d at 388.) Illinois Power maintains that Hartlein has not established this factor because he can neither claim a right to continued TTD benefits for lack of jurisdiction, nor a right to continued employment as a matter of law. Hartlein argues, however, that he established this factor by demonstrating that he was discharged in retaliation for exercising his rights under the Workers' Compensation Act. Hartlein cites to *Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, as demonstrating that employees, such as himself, possess a clear and certain right not to be retaliatorily discharged for their exercise of rights under the Act.

According to Illinois Power, any issue as to Hartlein's right to a continuation of his TTD benefits is within the province of the Illinois Industrial Commission. We would agree. The role of the circuit court in compensation proceedings is appellate only, and is limited by section 19(f) of the Workers' Compensation Act (Ill. Rev. Stat. 1989, ch. 48, par. 138.19(f)). (See *Gunnels v. Industrial Comm'n* (1964), 30 Ill. 2d 181, 185 (trial court lacked jurisdiction to

restrain a claimant from proceeding with petition before the Industrial Commission seeking a determination of the amount of compensation due and a penalty for delay of payment).) The circuit courts have no original jurisdiction over workers' compensation proceedings, wherein benefits are determined, under the Act. Under section 19(f) of the Act, the circuit courts exercise a special statutory jurisdiction and have only the powers that are conferred by statute. (See *Interlake Steel Corp. v. Industrial Comm'n* (1975), 60 Ill. 2d 255; *Ahlers v. Sears, Roebuck & Co.* (1977), 54 Ill. App. 3d 638; see also *Bragado v. Cherry Electrical Products Corp.* (1989), 191 Ill. App. 3d 136 (disallowing recovery of TTD benefits in retaliatory discharge action as determination of such benefits within the province of Industrial Commission).) As this court has previously noted, "the Act further provides that the statutory remedies under it shall serve as the employee's exclusive remedy if he sustains a compensable injury." *Sharp v. Gallagher* (1983), 95 Ill. 2d 322, 326.

The appellate court recognized that the trial court lacked jurisdiction to enjoin Illinois Power from discontinuing workers' compensation benefits. Thus, the appellate court narrowly construed the preliminary injunction as enjoining only Hartlein's discharge, a threat of such discharge, or an alteration of his employment status. We believe, however, that the preliminary injunction prohibited Illinois Power from discontinuing Hartlein's workers' compensation benefits as well, despite the limiting language contained in the trial court's order, which pertained to the absence of restraints upon the Industrial Commission. The record reflects that, certainly, Hartlein interpreted the preliminary injunction as restraining Illinois Power from terminating TTD benefits. Thus, to the extent that the order is susceptible to interpretation as enjoining Illinois Power from discontinuing Hartlein's workers' compensation benefits, such an order is beyond the scope of the trial

court's authority. Any right Hartlein might have had to continued TTD benefits was not properly protectible by means of the preliminary injunction.

We turn to consider Illinois Power's argument that Hartlein can claim no right to continued employment under law and Hartlein's counter argument that he possessed a right not to be retaliatorily discharged in accordance with *Kelsay*.

In *Kelsay*, 74 Ill. 2d 172, this court first recognized a retaliatory discharge cause of action. Such action represents an exception to the general rule that "at-will" employment is terminable at any time for any or no cause. (*Palmateer v. International Harvester Co.* (1981), 85 Ill. 2d 124, 128.) In *Kelsay*, an employee was discharged in retaliation for filing a workers' compensation claim against her employer. After examining the history and purpose of the Act, this court held that a cause of action based on the tort of retaliatory discharge was necessary to insure that the public policy underlying the enactment of the Act was not frustrated. See *Kelsay*, 74 Ill. 2d at 182-85; see also *Darnell v. Impact Industries, Inc.* (1984), 105 Ill. 2d 158, 161 (public policy violated by interference with any right under the Act).

Despite the revolutionizing effect of *Kelsay*, the common law doctrine that an employer may discharge an employee-at-will for any reason or for no reason remains the law in Illinois. (See *Fellhauer v. City of Geneva* (1991), 142 Ill. 2d 495.) *Kelsay* only excepts discharges which violate a clearly mandated public policy. (See *Barr v. Kelso-Burnett Co.* (1985), 106 Ill. 2d 520, 525.) Thus, Illinois law does not obligate an employer to retain an at-will employee who is medically unable to return to his assigned position (see *Horton v. Miller Chemical Co.* (7th Cir. 1985), 776 F.2d 1351); nor is an employer obligated to reassign such an employee to another position rather than terminate the employment (see *LaPorte v. Jostens, Inc.* (1991), 213 Ill.

App. 3d 1089). Similarly, an employer may fire an employee for excess absenteeism, even if the absenteeism is caused by a compensable injury. (See *Slover v. Brown* (1986), 140 Ill. App. 3d 618, 621 (injured employee's lengthy inability to work was considered valid basis for discharge or for employer's failure to rehire).) Simply put, "Illinois allows employers to act on the basis of their employee's physical disabilities; it is only the request for benefits that state law puts off limits as a ground of decision." *McEwen v. Delta Air Lines, Inc.* (7th Cir. 1990), 919 F.2d 58, 60.

A valid claim for retaliatory discharge requires a showing that an employee has been (1) discharged; (2) in retaliation for the employee's activities; and (3) that the discharge violates a clear mandate of public policy. (See *Hinthorn v. Roland's of Bloomington, Inc.* (1988), 119 Ill. 2d 526, 529.) The element of causation is not met if the employer has a valid basis, which is not pretextual, for discharging the employee. See *Slover*, 140 Ill. App. 3d at 620-21; *McEwen*, 919 F.2d at 60; *Marin v. American Meat Packing Co.* (1990), 204 Ill. App. 3d 302, 310-11; *Motsch v. Pine Roofing Co.* (1988), 178 Ill. App. 3d 169, 174.

Accepting only for the sake of argument that *Kelsay* gives rise to a *right* not to be retaliatorily discharged, the clarity and certainty of such a right must be sufficiently established before a preliminary injunction can be granted. (See *Allcott v. American Strawboard Co.* (1908), 237 Ill. 55.) An injunction should not be granted where the plaintiff's right is doubtful. (*Bondy v. Samuels* (1929), 333 Ill. 535.) In the present case, Hartlein's "right" to be free from a retaliatory discharge is doubtful; " 'a fair question as to the existence of the rights claimed' " was not demonstrated. *Dixon Association for Retarded Citizens*, 91 Ill. 2d at 524, quoting *City of Chicago v. Airline Canteen Service, Inc.* (1978), 64 Ill. App. 3d 417, 432-33.

First, we do not consider evidence that Illinois Power directed Hartlein to engage in a job search sufficient to show the fact or threat of discharge. Quite simply, Hartlein was not discharged by Illinois Power when the company told him to contact other potential employers, nor was evidence offered to rebut Martin's testimony that Illinois Power had no intention of discharging Hartlein. While the proposed job search might have eventually resulted in an end to Hartlein's employment relationship with Illinois Power, either voluntarily or involuntarily, the directive to search, in the context of these facts, does not constitute discharge. Indeed, Hartlein, himself, acknowledged as much, by stating, through his attorney, that he would not accept another job, by means of such a search, unless it was comparable to the job he had at Illinois Power. Furthermore, with regard to the fact of discharge, we decline to expand the tort to encompass a retaliatory discharge "process" as alleged by Hartlein.

The instant case is factually distinguishable from *Hinthorn v. Roland's of Bloomington, Inc.* (1988), 119 Ill. 2d 526, relied upon by the appellate court to demonstrate that directing an employee to apply for work with other employers effectively discharges the employee. In *Hinthorn*, the plaintiff was instructed to meet with the company's vice-president on the same day she suffered a work-related injury and sought medical attention. The officer told her that she should seek other employment as she had been " 'getting hurt too much—costing the company too much money.' " (*Hinthorn*, 119 Ill. 2d at 528.) He then directed her to sign a "Voluntary Resignation" form, which she signed because she understood she would lose her job if she did not. *Hinthorn*, 119 Ill. 2d at 528-29.

Hartlein, by contrast, was not threatened with a loss of employment if he failed to apply for other positions; he was not working at the time of Illinois Power's directive and had been collecting TTD benefits for over one year.

While Hartlein attempted to characterize the threatened loss of TTD as a loss of employment, nonetheless, it is not. Nor was Illinois Power's directive accompanied by conduct or statements which indicated a prohibited discriminatory intent on the part of Illinois Power. Rather, Hartlein was advised that the proposed work search was considered to be governed by workers' compensation law. Furthermore, it is undisputed that a similar directive to Hartlein to begin a work search had been communicated by Illinois Power in early 1989, with no consequence to plaintiff's employment status. No evidence was offered that, 16 months later, any such consequence would flow from that same or a similar directive.

Requiring Hartlein to look for a job elsewhere may be, as stated by the appellate court, "patently inconsistent with his continued employment at Illinois Power." (209 Ill. App. 3d 948, 954.) Nonetheless, a directive to start a job search, particularly, as part of a program of vocational rehabilitation, is not the equivalent of involuntary discharge. In order to receive TTD benefits, a workers' compensation claimant must establish not only that he did not work, but that he was unable to work (*Arbuckle v. Industrial Comm'n* (1965), 32 Ill. 2d 581), and that one is temporarily totally disabled when he cannot perform any services except those for which no reasonably stable labor market exists (*Zenith Co. v. Industrial Comm'n* (1982), 91 Ill. 2d 278). Furthermore, where rehabilitation of the injured employee is ordered, there are "boundaries which reasonably confine the employer's responsibility," including the requirement that a claimant make a good-faith effort to cooperate in the rehabilitation effort. (*Archer Daniels Midland Co. v. Industrial Comm'n* (1990), 138 Ill. 2d 107, 115-16, citing *National Tea Co. v. Industrial Comm'n* (1983), 97 Ill. 2d 424, 433.) A request that Hartlein demonstrate that he was unable to work or that he cooperate

with rehabilitation efforts, without more, is not to be equated with a discharge from Illinois Power.

We further decline to expand the tort of retaliatory discharge, on these facts, to encompass the concept of "constructive discharge." (See *Barr v. Kelso-Burnett Co.*, 106 Ill. 2d at 525 (finding that this court does not "strongly support" the expansion of the tort); see also *Grey v. First National Bank* (1988), 169 Ill. App. 3d 936, 942-43; *Scheller v. Health Care Service Corp.* (1985), 138 Ill. App. 3d 219, 224-25 (interpreting *Barr* as disallowing the recognition of constructive discharge concept).) That Illinois Power could conceivably utilize the threat of a termination of TTD benefits to force Hartlein to make *bona fide* efforts to seek other employment is, therefore, irrelevant to the fact of discharge.

The second, more fundamental problem concerning the evidence in support of a retaliatory discharge here lies with the element of causation. Concerning the element of causation, the ultimate issue to be decided is the employer's motive in discharging the employee. See *Marin v. American Meat Packing Co.*, 204 Ill. App. 3d at 310-11; *Austin v. St. Joseph Hospital* (1989), 187 Ill. App. 3d 891, 897.

In the present case, there can be no dispute that Hartlein was unable to perform as an apprentice lineman or even as a meter reader by December 1988. Furthermore, Martin testified, and indeed, additional evidence supported that Illinois Power considered Hartlein unable to perform his former job. Martin also reportedly told Cueto that that was the reason Hartlein would have to find another job. Martin also testified that Illinois Power had no available positions which Hartlein was capable of performing, and McKee stated that fact in correspondence to Hartlein. Martin further testified that Illinois Power, in directing Hartlein to start a job search and contact other

employers, believed that Hartlein was obligated to cooperate with such a directive in accordance with the Act.

The evidence also showed that by July 1988, Hartlein had been evaluated by two physicians as unable to resume his former position as an apprentice lineman. Specifically, Dr. Wayne opined that it did not appear that Hartlein could be rehabilitated to his former position. Additional evidence also showed that, at the time of Illinois Power's directive, Hartlein had been continuously receiving TTD benefits for approximately 16 months; and that while he had been released for work under certain restrictions, he was, nonetheless, unable to perform a second job assignment which had appeared to be within his physical limitations. As such, Illinois Power presented sufficient evidence of a valid basis for directing Hartlein to apply for other jobs.

Hartlein in turn alleged that Illinois Power was forcing him to quit his job because the company had tired of paying him TTD benefits. He further alleged that Cole's physical rehabilitation program was a sham, as it was not designed to rehabilitate him to resume his former position. Hartlein presented evidence that he had proposed assignment to several alternate positions within Illinois Power; Illinois Power had not responded to that proposal; he was "ordered" by Illinois Power to engage in the company's vocational placement efforts; Illinois Power wanted him to search for other employment, directed him to prepare resumes, start a job search, contact prospective employers; told him not to mention his foot injury to prospective employers; considered him to be "temporarily totally" disabled, yet intended to terminate his TTD benefits, without the benefit of a recent medical examination, if he did not make a *bona fide* effort to seek other employment.

An employer may legitimately seek to vocationally rehabilitate an injured employee when the employee is unable to perform the job he held when injured. (*Cf. Na-*

*tional Tea Co.*, 97 Ill. 2d 424 (employer failed to assume its responsibility to rehabilitate injured employee who could no longer perform assigned job).) Under the Act, an employer is obligated to provide for the physical, mental and vocational rehabilitation of the injured employee, including the costs and expense of maintenance. (See Ill. Rev. Stat. 1989, ch. 48, par. 138.8(a).) Indeed, the Industrial Commission has adopted a rehabilitation rule (the 120-day rehab rule) which provides:

> "The employer or his representative, in consultation with the injured employee and, if represented, with [the employee's] representative, shall prepare a written assessment of the course of medical care, and, if appropriate, rehabilitation required to return the injured worker to employment when it can be reasonably determined that the injured worker will, as a result of the injury, be unable to resume the regular duties in which he was engaged at the time of injury, or when the period of total incapacity for work exceeds 120 continuous days, whichever first occurs." (50 Ill. Adm. Code §7110.10 (1992).)

Such rehabilitative efforts may be taken even though "the issue of the extent of permanent disability cannot be determined." (See *Hunter Corp. v. Industrial Comm'n* (1981), 86 Ill. 2d 489, 501.) Although the parties have not raised the point, it would seem that Illinois Power's directive to Hartlein falls within the parameters of this rehab rule. As such, we would not consider the directive, in the context of these facts, to violate the principles established by *Kelsay*.

Furthermore, it is widely accepted that "[t]he primary goal of rehabilitation is to return the injured employee to work." (See T. Gifford, K. Gurber, W. Leahy & F. Wiedner, Worker's Compensation in Illinois 68 (1989); see also Gianforte, *Industrial Rehabilitation in Illinois—An Evolving Process*, 71 Ill. B.J. 668 (1983).) TTD benefits were not designed to continue indefinitely. (See *Archer Daniels Mid-*

*land Co. v. Industrial Comm'n* (1990), 138 Ill. 2d 107, 118 (once an injured employee's physical condition stabilizes, he is no longer eligible for TTD benefits, although he may be entitled to permanent partial or permanent total disability compensation).) While it may be that one of the by-products of undertaking rehabilitation is an eventual cessation of TTD benefits, that in no way makes such efforts on the employer's part discriminatory as defined by *Kelsay*.

Additionally, even assuming, *arguendo*, that Illinois Power had no authority to order Hartlein to engage in its vocational rehabilitation program, a plaintiff does not establish a claim for retaliatory discharge if all he can show is that his employer refused to grant him the rights and remedies that he was entitled to under the Act. (*Horton*, 776 F.2d at 1356.) Thus, no improper motive on Illinois Power's part was shown by its directive to Hartlein to engage in a job search as part of the company's rehabilitative program.

. Neither is improper motive revealed by Illinois Power's conditioning the payment of TTD benefits on Hartlein's efforts to apply for other jobs. *Kelsay*, 74 Ill. 2d 172, holds that the employer may not present the employee with a choice between his job and his legal entitlement to compensation. *Kelsay* thereby prohibits an employer from utilizing an employee's job as leverage to condition his exercise of rights under the Act; *Kelsay* does not, however, prohibit the leveraging of benefits under the Act to condition the exercise of employment rights. Furthermore, a determination of the propriety of that form of activity lies with the Industrial Commission. See *Hayden v. Industrial Comm'n* (1991), 214 Ill. App. 3d 749 (TTD justifiably terminated by the employer, under the Act, when the injured employee was unwilling to cooperate with vocational placement efforts); see also 2 A. Larson, Workmen's Compensation §61.24, at 10—1027 ("The incentive applied by compensation law to undertake rehabilitation may take the

form of the stick as well as of the carrot. Most unsubtle of all is simply to refuse benefits to a claimant who refuses rehabilitation"), §57.66(c), at 10—492.75 (the usual holding as to the effect of a refusal of suitable work is that it results in a suspension of benefits for the period of refusal) (1992).

In sum, we conclude that Hartlein's argument and supporting proofs did not show that Illinois Power's directive to Hartlein resulted from a prohibited, discriminatory intent to abridge his workers' compensation rights. The evidence does not reveal that Hartlein was retaliatorily discharged. Manifestly, the evidence was insufficient to establish the existence of a clear and ascertainable right in need of protection.

We need not consider whether the evidence sufficiently supported the existence of the three remaining factors necessary to preliminary injunctive relief, extent of harm, appropriateness of remedy and the likelihood of success on the merits. (See *In re Adoption of Scraggs*, 125 Ill. 2d at 388.) The insufficiency of the evidence to support a clear right obviates such a consideration.

Accordingly, we reverse the judgment of the appellate court, which affirmed the trial court's grant of a preliminary injunction, and reverse the judgment of the circuit court.

*Judgments reversed.*

JUSTICE CUNNINGHAM took no part in the consideration or decision of this case.